**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

JACQUELINE E. MARTIN,

          Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.

No. C-04-152-LRR

**ORDER**

_____

**TABLE OF CONTENTS**

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
       *A.*     *Consulting Sources* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
       *B.*     *Treating Sources* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

V.    *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
       *A.*     *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . **12**
       *B.*     *Martin's Residual Functional Capacity* . . . . . . . . . . . . . . **15**
            *1.*    *Credibility determination* . . . . . . . . . . . . . . . . . . . **15**
            *2.*    *Opinions of treating and consulting sources* . . . . . . . . . . . . **20**
       *C.*     *Martin Can Perform "Other Work"* . . . . . . . . . . . . . . . . . . **25**

VI.   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

## I.  INTRODUCTION

Plaintiff Jacqueline E. Martin seeks judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits (docket no. 3).  Martin asks the court to reverse and order the Commissioner of Social Security ("Commissioner") to provide her SSI benefits.  Finding no error in the Commissioner's decision, the court shall affirm.

## II.  PRIOR PROCEEDINGS

Martin applied for SSI benefits on April 16, 1999,[1] alleging an inability to work since March 29, 1999, due to depression and asthma.  Specifically, she reported that her alleged disabilities limit her ability to work because she cannot concentrate or function and she is very tired and depressed.  On September 30, 1999, the Commissioner denied Martin's application.  On March 23, 2000, it was also denied on reconsideration.  On May 19, 2000, Martin requested a hearing before an Administrative Law Judge (ALJ).  On February 13, 2001, Martin appeared without counsel before ALJ Laura Speck Havens for an evidentiary hearing.  No evidence was taken at that time and the hearing was continued on Martin's request.  On May 17, 2001, ALJ Havens held the hearing and Martin appeared with counsel.  Martin and vocational expert George Myers testified at the hearing.  In a decision dated August 28, 2001, the ALJ denied Martin's appeal.  The ALJ determined that Martin was not disabled and was not entitled to SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy.

---

[1]  Parts of the record indicate Martin filed her application on April 6, 1999, and other parts indicate she filed it on April 16, 1999.  The inconsistency seems to have arisen because the handwritten date on Martin's application is difficult to read.  The court finds that Martin filed her application on April 16, 1999.

Martin appealed the ALJ's decision, and, on July 22, 2002, the Appeals Council vacated the August 28, 2001 decision and remanded the case for further consideration. On January 7, 2003, ALJ Havens held an additional evidentiary hearing. Martin was present with her attorney. She and vocational expert Steven Schmidt testified at the hearing. On May 23, 2003, ALJ Havens issued a second unfavorable decision. Again, ALJ Havens found that Martin "is able to adjust to other work that exists in significant numbers in the national economy" and is, therefore, "not disabled." On September 8, 2004, the Appeals Council denied Martin's request for review. Consequently, the ALJ's May 23, 2003 decision stands as the Commissioner's final decision.

On November 30, 2004, Martin filed this action for judicial review. On February 7, 2005, the Commissioner filed an answer. On March 24, 2005, Martin filed a brief arguing that there is not substantial evidence in the record to support a finding that she has the mental functional capacity to perform work. On May 23, 2005, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking this court to affirm the ALJ's decision.

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 1383(c)(3) provides that the Commissioner's final determination after a hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). "The court shall have the power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.*

The court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir.

2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)).  Substantial evidence is more than a mere scintilla.  *N.L.R.B. v. La-Z-Boy Midwest*, 390 F.3d 1054, 1058 (8th Cir. 2004).  It means relevant evidence a reasonable mind might accept as adequate to support a conclusion.  *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)).

The court must not re-weigh the evidence, but rather simply inquire as to whether "a reasonable person would find [the evidence] adequate to support the ALJ's determination." *Vester*, 416 F.3d at 889 (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004) and *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  *Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998).  The court must not only consider the evidence in the record that supports the Commissioner's determination, but also any evidence that detracts from it.  *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005).  While inaccuracies and unresolved conflicts of evidence can serve as a basis for remand, "a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case . . . .'" *Id.* (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000)).

## V. FACTS

Martin was born on November 23, 1967.[2] She graduated from high school and attended college for two years.

At the May 17, 2001 administrative hearing, Martin testified that, among other things, she can read a newspaper and do simple math. Martin testified that she had only worked one job in the fifteen years before the alleged disability date of March 29, 1999. She worked as a clerical worker in 1998. She has otherwise supported herself and her three children by receiving assistance from AFDC.[3] She testified that she wakes up at about 7:00 a.m. on school days and she "tries" to help her children get ready for school. She also tries to help them complete their homework. Martin bathes and dresses herself. Martin testified that her children do the household chores for her. She testified that she occasionally cooks, washes the dishes and vacuums. She does laundry, shops for groceries, drives a car and handles the family's money. Martin testified she has no hobbies, does not exercise and does not participate in activities outside of her home. She testified that she used to attend church but she stopped attending because she "just didn't want to be bothered with people [and] just didn't want to have to get dressed, to talk to the people." Martin testified that she does not use street drugs, that she last used them in 1994 and that she does not drink alcohol. She testified that both eating and sleeping are

---

[2] There is also some inconsistency in the record regarding Martin's date of birth. In the May 17, 2001 hearing, Martin testified that she was born on November 23, 1964. However, in her 1995 application for a Social Security card, she swore that she was born on November 23, 1967. The court finds the three-year difference in age is irrelevant in this matter.

[3] The acronym "AFDC" refers to the Aid to Families with Dependent Children program. *See* U.S. Department of Health & Human Services, http://www.acf.dhhs.gov/programs/afdc/afdc.txt (last visited Mar. 2, 2006).

difficult. Martin testified that, after she stopped attending mental health group therapy on December 22, 1999, she did not attend again until February or March of 2001. Martin testified that she was currently taking Paxil and Diazepam. She reported that the side effects were that she was "ready to hurt somebody" because she was "very short" and "very aggressive."

At the May 17, 2001 hearing, vocational expert George Myers also testified. Using a hypothetical, Myers testified that there were about 55,000 light and sedentary jobs and 8,000 light unskilled jobs in California which someone fitting the hypothetical could do.

On January 7, 2003, Martin testified at her second administrative hearing. Martin testified that, in 1991, she worked in customer service for about four months and, in 1998, she was a clerical worker for a couple of days. Martin testified that she was homeless at the time of the hearing, that her children were living in Iowa and that she was "trying to get stabilized" by getting back on Medi-Cal[4] so she could take her medications regularly. She testified that she had not seen a doctor since August 2002, but was taking Celexa, Ativan, Albuterol and Prednisone. When asked whether she experienced shortness of breath due to her asthma, Martin told the ALJ that she did not take her steroids because "it was a good year last year."

Vocational expert Steven Schmidt also testified at the January 7, 2003 hearing. The ALJ asked Mr. Schmidt to consider a hypothetical. The ALJ asked the expert to assume an individual of Martin's age, education and vocational background. He was further asked to assume the need to avoid a moderate level of environmental irritants; assume the individual had a poor ability to deal with work stress, a fair ability to relate to co-workers,

_____

[4] Medi-Cal is California's equivalent to Medicaid. It provides health and long-term care coverage to low-income citizens of California. *See* California Health Care Foundation, http://www.chcf.org/topics/medi-cal/index.cfm (last visited Mar. 2, 2006).

supervisors, and the general public, and a fair ability to understand, remember, and carry out complex instructions and detailed instructions, follow work rules, and use judgment. In addition, Mr. Schmidt was asked to assume the individual had a fair ability to behave in an emotionally stable manner and demonstrate reliability. Mr. Schmidt concluded that Martin could not perform her past work. He testified that she could perform the work of an assembler. There were 47,000 such jobs in California.[5]

## A. Consulting Sources

On July 6, 1999, Charles L. Hutchins, M.D., performed a pulmonary function study on Martin on a consultative basis. Dr. Hutchins determined that Martin may have "small airway disease" because she had "reductions in expiratory air flow at low lung volumes." The report states, however, that "there is significant improvement in several parameters after bronchodilator administration suggesting there may be a reversible component."

On July 9, 1999, Martin was seen on a consultative basis by James Martin, M.D., a specialist in general practice and internal medicine. Dr. Martin's assessment was based upon information provided by Martin in conjunction with a physical examination. He concluded that Martin had "possible psychological problems" and "mild to moderate" asthma. Dr. Martin explained that Martin "should be provided a work environment devoid of any known bronchospastic agents due to her asthma." However, Dr. Martin also noted that Martin's "self reported reasons" for being unemployed did not relate to her asthma.

---

[5] Mr. Schmidt also testified that Martin could perform the job of a "cleaner" at the light exertional level and unskilled level, and he testified that there are 150,000 such jobs. However, when cross-examined, Mr. Schmidt then retracted the possibility of a cleaning job because performing such jobs would require exposure to more than "slight environmental irritants."

Dr. Martin suggested additional testing of Martin, including a formal pulmonary function test and a formal consultation with a psychologist.

On September 21, 1999, Martin was examined by Roger S. Smith, D.O., a psychiatrist, on a consultative basis. Dr. Smith noted that Martin was "alert and oriented," "seemed to have a positive outlook towards the future in general," her memory was "intact," her intelligence was "average" and her concentration was "sufficient." Combining Martin's psychiatric history with his examination of her, Dr. Smith concluded that Martin's ability to "deal with the public [and] relate and interact with supervisors and co-workers [was] limited, but not completely impaired." Dr. Smith further concluded:

> [Martin's] ability to maintain concentration and attention, and ability to understand, remember, and carry out simple one or two step job instructions is satisfactory.
>
> [Martin's] ability to withstand the stress and pressures associated with an eight-hour work day and day-to-day work activity is limited.
>
> The above-mentioned limitations relate to some of her features of depression, especially her poor motivation. She also is a single parent of a 3-year-old, 6-year-old, and 8-year-old and appears to have her hands full at this point.

Dr. Smith concluded that Martin had "major depression, moderate," a history of asthma, and "[o]ccupational problems and single parent problems." Dr. Smith rated Martin's Global Assessment of Functioning, or GAF, at 65.

On June 27, 2001, Martin was examined on a consultative basis by Dr. Gregory Fields, Ph.D. Dr. Fields obtained all of his information from examining Martin. Martin told Dr. Fields that she had been out of her medications for approximately two months, and she admitted that her mood is worse when she is not taking her medications. Martin told Dr. Fields that she lives with and takes care of her three children. She can "shop for

groceries, prepare meals, do laundry, and do housework," and she manages the family finances. Even though she is capable of completing all normal daily activities, Martin told Dr. Fields that "everything is a struggle." Martin reported a depressed and anxious mood, but Dr. Fields reported that Martin appeared mildly dysphoric in her examination. She was oriented and had intact attention and concentration abilities. Her memory was intact. Dr. Fields tested Martin and determined that her intelligence was average and her memory was "average to low average." Dr. Fields diagnosed Martin with "Depressive Disorder, NOS," (i.e., depressive disorder, not otherwise specified). Dr. Fields summarized Martin's abilities:

> Based on today's evaluation, [Martin's] ability to relate to others in an appropriate manner including peers, co-workers, supervisory personnel, and the general public is mildly limited.

> [Martin's] ability to understand and follow simple and straightforward instructions is unimpaired. Her ability to maintain appropriate levels of concentration, pace, and persistence required to perform one or two-step simple and repetitive tasks is unimpaired.

> Based upon today's performance, [Martin's] ability to manage the stress and pressure associated with the interview and cognitive examination is estimated to be mildly limited.

> Based on the results of this evaluation, [Martin's] performance is suggestive of an individual with the cognitive capacity to handle basic day-to-day financial transactions.

Dr. Fields also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." In Dr. Fields' opinion, Martin's "ability to understand, remember, and carry-out instructions" was "slightly" affected by her impairment. Martin had "slight" limitations in three categories: (1) understanding and remembering detailed instructions, (2) carrying-out detailed instructions and (3) making judgments on simple work-related

decisions. Dr. Fields further noted that Martin's "ability to respond appropriately to supervision, co-workers, and work pressures in a work setting" were affected by her impairment in the following ways: (1) her ability to interact appropriately with supervisors and co-workers was slightly limited, (2) her ability to respond appropriately to changes in a routine work setting was slightly limited and (3) her ability to respond appropriately to work pressures in a usual work setting was moderately limited.

### B. Treating Sources

On October 13, 1999, Martin became a new patient of David S. Kerwin, Jr., M.D. Dr. Kerwin completed a "new patient history and physical examination" form regarding the examination on that date. Dr. Kerwin noted that Martin was seeking "ongoing care because of asthma, possible bipolar disorder and possible athlete's foot." Martin complained of depression and severe pre-menstrual syndrome, and Martin informed Dr. Kerwin that her counselor, Debbie Taylor, suggested she might be bipolar. The report notes that Martin had medication for her asthma and depression at home, but she admittedly failed to take them as prescribed. Dr. Kerwin determined that Martin had "probable bipolar disorder," asthma and "possible athlete's foot." He prescribed Serevent, Aerobid M, Albuterol, Theodur and Zoloft medications. Dr. Kerwin concluded that Martin should have an appointment with a psychiatrist "to confirm the diagnosis and suggest further treatment."

On November 2, 1999, Martin was examined by a psychiatrist, Manuel Chua, Jr., M.D., due to Dr. Kerwin's referral. Dr. Chua noted that Martin first became depressed after the birth of her son in 1992 and became even more depressed after the birth of her daughter in 1995. Martin self-reported depressive symptoms, such as frequent crying spells, irritability and feelings of worthlessness. Dr. Chua noted that Martin had taken anti-depressant medication prior to June 1999, but had "ran out" of the medication and had

only been taking it since Dr. Kerwin prescribed it on October 13, 1999.  Dr. Chua noted that Martin was "tearful" and "distracted" during the examination.  She had "difficulty organizing her thoughts" and was "tense and anxious."  Dr. Chua concluded that Martin's "attention[,] concentration and memory are impaired[,]" her "insight and judgement is poor" and her "level of intellectual functioning is average."  Dr. Chua's diagnosis ruled out bipolar disorder.  He diagnosed Martin with "[m]ajor depression, recurrent, severe, without psychotic features."  Moreover, he scored her with a GAF of 45/50.  Dr. Chua increased the dosage of Martin's Zoloft prescription, advised her to seek counseling and scheduled a follow-up appointment for December 1999.

In December 1999, Martin attended a depression therapy group.  She was a "no show" for a follow-up appointment with Dr. Chua in January 2000.

Martin continued to have appointments with Dr. Kerwin as her primary physician.  The record contains documentation of six appointments Martin had with Dr. Kerwin between January 26, 2000, and April 26, 2001.  Only two of the records reflect any complaints or discussion about Martin's mental health: on May 2, 2000, Martin complained about insomnia, depression and anxiety, and on April 26, 2001, she complained about anxiety.  In a report dated June 6, 2000, Martin's "mood and affect [were] within normal limits," she was "alert and oriented x3," and her "[i]nsight and judgment seem[ed] to be normal."

Following the hearing and the May 23, 2003 decision, Martin submitted additional evidence to the Appeals Council.  On December 23, 2003, Martin was examined by Carol Aunan, APRN, BC, a family psychiatric nurse practitioner.  Martin told Ms. Aunan that she had a history of depression and mood swings, but that she had been off of her medications for a year and a half.  Ms. Aunan reported that Martin is "a bit" dramatic.  Martin reported that marijuana is her drug of choice because it helps her sleep and it helps

with her anxiety. If she could afford it, Martin would buy marijuana everyday. Martin reported using marijuana about ten times in November and December of 2003. Martin also reported abusing alcohol at times—drinking half of a fifth of hard liquor. She has also tried other illegal substances, such as cocaine, methamphetamine, Quaaludes, "uppers" and "speed." Ms. Aunan diagnosed Martin with "Bipolar Affective Disorder, type 2," "Post Partum Exacerbation," "Panic Disorder without Agoraphobia," "Cannabis Dependence," "Alcohol Abuse," "Borderline Personality Disorder" and "Asthma." Ms. Aunan assessed Martin with a GAF of 50. Ms. Aunan prescribed lithium and wanted Martin to return for follow-up appointments every two weeks.

On January 6, 2004, Martin had a follow-up appointment with Ms. Aunan and Martin reported that she continued to be depressed. Ms. Aunan altered Martin's prescriptions slightly.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Martin is not disabled. In determining whether a claimant is disabled, the ALJ must complete a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)–(f); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen*, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing *Yuckert*, 482 U.S. at 140–42); *see also* 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of their credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir.

2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).  "The ALJ must first evaluate the claimant's credibility before  determining a claimant's RFC."  *Id.* (citing *Pearsall*, 274 F.3d at 1217).

Under the first step of the analysis, the ALJ determined that Martin had not engaged in substantial gainful activity since March 29, 1999.  At the second step, the ALJ determined that Martin had two severe impairments, namely, asthma and depression.  At the third step, the ALJ found that Martin's impairments were not equivalent to one of the listed impairments, because "the medical evidence does not contain the appropriate clinical or laboratory findings to substantiate [Martin's] impairments meet or equal the level of severity . . . described in the Listing of Impairments contained in [the Regulations].[6]

At the fourth step, the ALJ determined Martin's RFC as follows:

> [Martin] retains the residual functional capacity to perform work at any exertional level.  However, because of her asthma, she must avoid moderate exposure to dust, fumes, and smoke.  With regard to her depression, the undersigned has accorded the claimant the benefit of every tenable doubt, and has found that she has a poor ability to deal with work stress; a fair ability to relate to supervisors and coworkers; a fair ability to understand, remember, and carry out complex or detailed job instructions; a fair ability to follow work rules; a fair ability to use judgment; a fair ability to behave in an emotionally stable manner; and a fair ability to demonstrate reliability.

Using this RFC, the ALJ determined that Martin met her burden of proof at the fourth step, because she was unable to perform her past relevant work.  At the fifth step, however, the ALJ determined that Martin was able to make a vocational adjustment to

---

[6] In Martin's brief, she "concedes that the evidence would support a determination that Martin does not meet or equal the listing for her impairments."

work that exists in significant numbers in the national economy. Thus, the ALJ concluded that Martin was "not disabled."

Martin alleges that the ALJ erred in several respects. Martin argues that the ALJ erred in determining her RFC because the ALJ improperly determined Martin's credibility and failed to give appropriate weight to the opinion of her treating sources, namely, Dr. Chua. Martin argues that the ALJ's RFC was not supported by substantial evidence. Martin also argues that the ALJ gave an improper hypothetical and did not properly determine that she could perform "other work."

## B. Martin's Residual Functional Capacity

Martin first argues that "the ALJ's determination of non-exertional RFC is flawed and has no evidentiary support." She specifically argues that the ALJ erred in considering her credibility and in failing to give weight to the opinion of her treating psychiatrist. Martin seeks to have the ALJ's determination of the RFC reversed because it is not supported by substantial evidence in the record. The Commissioner argues that the ALJ properly determined Martin's RFC after considering all relevant evidence, including medical records, observations of treating physicians and others and the claimant's own description of her limitations.

### 1. Credibility determination

Before determining an RFC, the ALJ must make a credibility determination. *See Tellez*, 403 F.3d at 957. Here, the ALJ determined that Martin was not fully credible. Martin argues that the ALJ improperly rejected her subjective complaints of depression and dysfunction. The Commissioner argues that the ALJ properly found Martin's complaints not credible by following the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and the regulations at 20 C.F.R. § 404.1529 (2000).

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. "The [ALJ] is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (emphasis in original). In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *Id.* at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart*, 433 F.3d at 578 (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001); *see Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence).

First, the ALJ noted discrepancies in Martin's statements regarding her medications: on September 13, 1999, Martin told Dr. Smith that she stopped taking her anti-depression medication when her Medi-Cal insurance was discontinued; on October 13, 1999, Martin told Dr. Kerwin that she had Zoloft at home but stopped taking it voluntarily; and on November 2, 1999, Martin told Dr. Chua that she simply "ran out" of her Zoloft in June. *Compare* Record at 158 (reporting "[Martin] has Zoloft at home, but never took it long enough to tell if it would do her any good"), *with* Record at 154 (reporting that Martin told Dr. Smith that she stopped taking her anti-depressant medications when her Medi-Cal was

discontinued), *and* Record at 169 ("The patient previously has been prescribed Zoloft by her primary care physician, but she ran out of her medications in June of this year."). The ALJ determined that Martin was "less than fully credible" because she claimed her depression was resistant to treatment, yet, during her October 13, 1999 examination with Dr. Kerwin, she admitted that she voluntarily discontinued taking Zoloft. The ALJ discussed Dr. Chua's November 2, 1999 examination of Martin:

> [Martin] did not indicate that she had voluntarily stopped taking the medication and still had Zoloft at home, as she had just told Dr. Kerwin just a few weeks before. This suggests that she was trying to present her condition in the best possible light, and to trying [sic] conceal the fact that she had not been compliant in the past, which detracts from an overall picture of credibility.

The ALJ also noted that there was a "lack of medical documentation" to support Martin's allegations of extreme dysfunction. *See* Record at 26 (finding Martin's allegations of extreme dysfunction "not fully credible" because there is no medical documentation of such dysfunction). The ALJ noted that, although Martin reported "extreme dysfunction and a near vegetative existence" on November 2, 1999, six weeks earlier, she told Dr. Smith that she was able to "drive a car, take a bus, shop for groceries, prepare meals, dress and bathe herself, read, watch television, and socialize with friends[,]" in addition to "manag[ing] her own money and pa[ying] her own bills." The ALJ found that Martin's statements regarding her ability to function were inconsistent.[7]

---

[7] Although the ALJ found Martin's statements regarding her lack of drug or alcohol abuse credible, the court notes that the record contains contrary information. During her November 2, 1999 evaluation with Dr. Chua, Martin denied the use of alcohol or drugs. Similarly, during her June 2001 evaluation with Dr. Fields, she denied current or past abuse of illegal drugs. At the May 17, 2001 hearing, Martin testified that she had

(continued...)

Allegations of disability by a claimant may be properly discounted due to inconsistencies such as minimal or conservative medical treatment. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (discounting subjective complaints of pain and disability where record showed that claimant had never undergone surgery and had "relied on a conservative course of treatment"); *see also Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) (noting that an ALJ is entitled to discount a claimant's complaints of pain where the claimant failed to pursue regular medical treatment and where the complaints were inconsistent with the medical evidence). Moreover, in making her credibility determination, the ALJ was permitted to consider Martin's medical non-compliance and the fact that Martin's conditions were controllable through medication. *See Tellez v. Barnhart*, 403 F.3d 953, 957 & n.3 (8th Cir. 2005) (affirming the ALJ's credibility finding where the ALJ noted that the claimant "regularly missed medication checks and psychiatric appointments" and failed to take her medications as prescribed); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (citation omitted); *see also Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (explaining that a claimant's failure to take pain medication was relevant to the credibility determination).

There is substantial evidence in the record that Martin received conservative and minimal treatment for both her asthma and her alleged mental conditions. Although

---

[7](...continued)
not used street drugs since 1994 and that she did not drink alcohol. Those are the statements upon which the ALJ relied in her May 2003 decision. However, during Martin's December 2003 evaluation at the Abbe Center, Martin reported using marijuana throughout her life since the age of fourteen. She reported that the drug helps her sleep and helps her anxiety, and that she would use marijuana every day if she could afford it.

Martin has been treated for asthma for several years, the record shows that she has only received intermittent treatment for her alleged mental conditions. The record also shows that Martin failed to follow through with her mental health treatment. For example, in January 2000, Martin was a "no show" for a follow-up appointment with Dr. Chua. Dr. Fields noted that Martin self-reported that she had "dropped out" of therapy at the Stanislaus Behavioral Health Center. After attending group therapy in December 1999, Martin did not seek further psychiatric treatment.

The testing conducted by Dr. Hutchins indicated that Martin could control her asthma through the proper use of medications. However, as early as 1997, Martin's medical records indicate she was inconsistently taking her asthma medications. A medical record entry dated May 8, 1997, indicates that Richard H. Davis, M.D., had a discussion with Martin regarding using her prescription drugs properly. The entry reads: "discussed meds at length—importance of using [inhaler] twice a day consistantly [sic] emphasized . . . ." During her October 13, 1999 appointment with Dr. Kerwin, Martin reported that, although she had two different asthma inhalers at home, she only used the Albuterol inhaler.

The record is replete with evidence that Martin was prescribed medications to help improve her depression and mood, but she failed to take the medications as prescribed. *See, e.g.*, Record at 158 (informing Dr. Kerwin on October 13, 1999, that she "ha[d] Zoloft at home, but never took it long enough to tell if it would do her any good"). Additionally, the record includes substantial evidence that, had Martin taken her medications as prescribed, her complained-of conditions would have been controlled. *See* Record at 169 (reporting on November 2, 1999, that Martin had been "functioning very poorly" since being off of her Zoloft medication); Record at 248 (self-reporting on June 27, 2001, that her mood had somewhat worsened over the last two months since she

had not been taking her medications). During most of Martin's appointments with Dr. Kerwin in 1999, 2000 and 2001, she did not complain of psychological problems, specifically, insomnia, depression or anxiety.

The record contains substantial evidence that the asthma and anti-depressant medications adequately controlled her conditions and that Martin failed to take her medications as prescribed. The ALJ properly considered Martin's medical non-compliance and the fact that her conditions were controllable through medications when the ALJ determined that Martin was not totally credible.

Therefore, the court concludes that the ALJ properly discounted Martin's complaints because there were significant inconsistencies in the evidence as a whole. *Pelkey*, 433 F.3d at 578. Moreover, the ALJ properly gave reasons for discrediting Martin, *id.*, and the court will not disturb that credibility determination, *Johnson*, 240 F.3d at 1147. After considering the weight of the evidence and balancing the factors supporting the ALJ's credibility determination against the factors in support of Martin's claim, this court holds that the ALJ's determination that Martin's allegations of total inability to work were not fully credible is supported by substantial evidence.

### 2. *Opinions of treating and consulting sources*

Martin argues that the ALJ neither adequately considered the treating source opinions nor explained the weight she gave them. Martin argues that the ALJ erred when discounting the opinion of her treating psychiatrist, Dr. Chua, who scored her with a GAF of 45/50 and diagnosed her with recurrent and severe major depression. The Commissioner replies that the ALJ properly determined the weight to be given to the reports of each source and explained her reasoning for giving greater weight to the opinions of the consulting doctors.

The Eighth Circuit Court of Appeals has instructed:

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). Furthermore, on remand, the Appeals Council specifically instructed the ALJ to "[g]ive consideration to the treating and examining source opinions. . . and explain the weight given to such opinion evidence." Record at 100. "Although the treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (concluding that it is the "function of the ALJ to resolve the numerous conflicts of opinion" of the "various treating and examining physicians").

Generally, "'[t]he opinion of a consulting physician who examines a claimant once'" does not constitute "'substantial evidence.'" *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003) (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). There are two exceptions to that general rule. *Id.* An ALJ's decision to credit a one-time consulting physician's opinion and discount a treating physician's opinion should only be upheld: "'(1) where [the one-time] medical assessments are supported by better or more

21

thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

Moreover, when the claimant is a new patient to the treating physician, that physician's opinion need not be given the controlling weight that is typically given to a treating source. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) ("[The treating physician's] March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When [the treating physician] filled out the checklist, [she] had only met with [the claimant] on three prior occasions."). The regulations state: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. §§ 404.1527(d)(2)(I) and 416.927(d)(2)(I).

The treating and consulting physicians had differing opinions regarding Martin's mental health. On March 24, 1999, Martin presented herself for depression treatment at the Stanislaus County Department of Mental Health. She was evaluated and treated by a therapist who diagnosed her with a marital problem, a "major depressive disorder, single episode, moderate," and rated her with a GAF of 52. On July 9, 1999, Dr. Martin saw Martin on a consultative basis, determined that she had "possible psychological problems," and suggested a psychological evaluation. The psychological evaluation occurred on September 13, 1999, with Dr. Smith, a psychiatrist. Dr. Smith opined that Martin had "major depression, moderate" and gave her a GAF of 65. One month later, on October 13, 1999, Martin's treating physician, Dr. Kerwin, noted that Martin had "probable bipolar disorder"[8] and suggested she be evaluated at a mental health facility.

[8] Dr. Kerwin's assessment of "probable bipolar disorder" was based upon Martin's
(continued...)

On November 2, 1999, over seven months after the alleged onset of her disability, Martin was first seen by her treating psychiatrist, Dr. Chua, who diagnosed her with major depression and a GAF of 45/50. Dr. Chua met with Martin again on December 7, 1999, and December 16, 1999, but Martin was a "no show" for her January 13, 2000 appointment. Consulting psychologist, Dr. Fields, examined Martin on July 12, 2001, and diagnosed her with "depressive disorder, NOS" and determined that she had only slight to moderate limitations in her ability to work.

In the ALJ's May 23, 2003 decision, she stated "the undersigned accords little evidentiary weight to Dr. Chua's extreme assessment, which is inconsistent with Ms. Martin'[s] earlier statements and the medical evidence to date." Instead, the ALJ gave "significant evidentiary weight to Dr. Smith's opinion," and noted that the opinion was "substantiated by [Dr. Smith's] clinical observations and [Martin's] performance on mental status testing, and which is also consistent with Ms. Martin's statements regarding her activities of daily living." Additionally, the ALJ stated: "As Dr. Fields' opinion is substantiated by extensive psychological testing, and as it is consistent with the opinion of previous examining psychiatrist, Dr. Smith, the undersigned accords significant weight to his opinion that the claimant can perform simple, repetitive tasks with only mild limitations on her ability to interact with others."

There is a significant difference between Dr. Chua's GAF of 45/50 and Dr. Smith's GAF of 65. The Eighth Circuit Court of Appeals explained the GAF scale:

> According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global

---

8(...continued)
self-reporting and the suggestion of a counselor. Dr. Kerwin's report states: "[Martin] has a counselor, Debbie Taylor, who was talking to [Martin] about [Martin's PMS] and suggested that [Martin] might be bipolar and need some medication." Record at 158-59.

Assessment of Functioning Scale is used to report "the clinician's judgment of the individual's overall level of functioning." GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Manual* at 34. GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

*Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (emphasis in original). A GAF scoring range of 61 to 70 is indicative of "mild" symptoms. *See Sultan v. Barnhart*, 368 F.3d 857, 859-60 (8th Cir. 2004) (explaining that a GAF of 70 indicated "some mild symptoms (such as depressed mood or insomnia) or some difficulty in social, occupational, and school functioning but generally good functioning and some meaningful interpersonal relationships"); *Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002) ("A GAF score of 61-70 reflects mild symptoms or 'some difficulty' in [social, occupations, or school functioning], but the individual 'generally function[s] pretty well.'").

The court finds that there was substantial evidence here to support the ALJ's decision to give greater weight to the opinions of consulting sources, Drs. Smith and Fields, and less weight to the opinion of treating physician, Dr. Chua. Martin was only seen by Dr. Chua on three occasions within a time span of less than two months in late 1999. Dr. Chua had no history of treating Martin before the date she alleges she became disabled—March 29, 1999. The record shows that the November 2, 1999 appointment was the first time Dr. Chua met Martin. Dr. Chua's treating history was not lengthy and, therefore, entitled to less weight than, for example, a treating source who had been treating a claimant for several months or years. *See, e.g.*, 20 C.F.R. §§ 404.1527(d)(2)(I) and

416.927(d)(2)(I). In addition to the lack of treating history, both Drs. Smith and Fields' opinions were based upon "better" and "more thorough medical evidence" than Dr. Chua's and their opinions were consistent with the bulk of the record. *See Anderson*, 344 F.3d at 813. Both Drs. Smith and Fields conducted a mental status examination on Martin and concluded that she had significant work-related abilities. They both concluded that she can understand, remember and carry-out instructions. Therefore, the ALJ's decision to give Dr. Chua's differing opinion "little evidentiary weight" was proper.

The court finds that the ALJ considered all of the relevant evidence in this case, including the medical records of Martin's treating sources and Martin's own description of her conditions. *See Tellez*, 403 F.3d at 957. The ALJ's determination of Martin's RFC was influenced by her finding that Martin was not fully credible and her finding that Dr. Chua's opinion should be given less weight than the differing opinions of Drs. Smith and Fields. The ALJ's determination of the RFC is supported by substantial evidence and shall be affirmed.

### C. Martin Can Perform "Other Work"

Martin argues that the ALJ presented an improper hypothetical to the vocational expert, Steven Schmidt, because the ALJ improperly disregarded the opinion of Dr. Chua and stated that the hypothetical person had a "fair ability to understand, remember, and carry out" both complex and detailed job instructions. Martin claims that the inclusion of this statement in the RFC was erroneous, because the ALJ relied primarily upon the opinion of Dr. Fields. Martin argues that Dr. Fields' June 27, 2001 Medical Source Statement is inconsistent with the hypothetical question because Dr. Fields' Statement provides that Martin's ability "to perform one or two-step simple and repetitive tasks is unimpaired." The Commissioner argues that the ALJ properly asked the hypothetical question and determined that Martin could perform other work.

The testimony of a vocational expert witness may be used to determine whether a claimant can perform other work which exists in significant numbers in the national economy where the claimant has non-exertional limitations. *See* 20 C.F.R. §§ 416.960(c), 416.969, and 426.1569a. An improper hypothetical cannot serve as substantial evidence. *See Guilliams*, 393 F.3d at 804 ("A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. *Newton v. Chater*, 92 F.3d 688, 694-95 (8th Cir. 1996). The question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ. *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997).

Here, the ALJ posed a hypothetical question to the expert, Mr. Schmidt. The ALJ explained that the hypothetical claimant had, in part, a "fair ability to understand, remember, and carry out complex job instructions. A fair ability to understand, remember, and carry out detailed job instructions." In response, Mr. Schmidt testified that such an individual could perform the job of an assembler. There were 47,000 such jobs which existed in California.[9]

The court finds that Dr. Fields' assessment is consistent with the ALJ's RFC finding and the hypothetical question given to Mr. Schmidt. In his assessment, Dr. Fields not only found that Martin's ability to carry-out *simple tasks* was unimpaired, Record at 250, but he also found that her "ability to understand, remember, and carry-out *detailed* instructions was only slightly impaired, Record at 252. The term "slight" impairment was

---

[9] Vocational expert George Myers testified at Martin's first hearing that there were about 55,000 light and sedentary jobs in California.

defined as follows: "There is some mild limitations in this area, but the individual can generally function well." Record at 252. Therefore, there is nothing inconsistent about the ALJ's hypothetical and the substantial evidence in the record. The ALJ's use of the term "fair ability" is consistent with "slight impairment." The court finds that the ALJ properly posed the hypothetical question to Mr. Schmidt. The ALJ, in turn, properly determined that Martin could perform the job of an assembler, which exists in significant numbers in the national economy.

## VI. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1)     The final decision of the Commissioner of Social Security is **AFFIRMED**;

(2)     Plaintiff's Complaint (docket no. 3) is **DISMISSED** with prejudice; and

(3)     The Clerk of Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

DATED this 14th day of March, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA